FIRST NATIONAL BANK OF WHITEHALL, Respondent, *v.* JAMES LAMB; et al., Appellants.

No privilege of immunity from the usury laws of the States is conferred upon national banks by the act of Congress of 1864 (13 Stat. at Large, 99), and a contract for a loan, made in this State, with one of these organizations, by which it reserves a greater rate of interest than seven per cent, is void.

The provision of section 30 of said act, limiting the forfeiture to the interest has reference only to the preceding sentence, which prescribes a rate of interest in those States and Territories where no rate is fixed by law. A construction of this provision which would make it applicable to contracts made in States where the rate of interest is regulated, and which would bring it in conflict with State laws, would render it unconstitutional.

The power to create a corporation as an appropriate instrument for the execution of a constitutional power vested in the federal government, only carries with it authority to confer upon that corporation such privileges or immunities from State laws as are necessary to enable it to effect the legitimate national object for which it is created. No such national object requires that national banks should exceed the rates of interest fixed by the States, and no immunity from State usury laws is, therefore, necessary.

(Argued April 3, 1872 ; decided November 12, 1872.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, affirming a judgment in favor of plaintiff, entered upon a verdict.

The plaintiff in this action is a national bank organized under the act of congress of June 3, 1864. The action was upon a promissory note against the makers and indorsers. The defense set up was usury, in corruptly taking more than seven per cent per annum for the loan of the money for which the note was given. The judge at circuit held that the State laws against usury did not apply to national banks, and this was affirmed at General Term. (Reported below, 57 Barb., 429.)

*L. H. Northrup* for the appellants. The contracts of national banks are governed and construed by State laws. ( 5 Wal., 462; *National Bank* v. *Commonwealth,* 9 Wal., 353, 363.)

*W. A. Beach* for the respondent. National banks are exempt from all State interference tending to diminish or interrupt their efficiency as agents of the federal government. (*McCulloch* v. *The State of Maryland,* 4 Wheat., 316; *S. C.,* 4 Con. U. S. Rep., 466; 486; *Osborn* v. *Bank U. S.,* 9 Wheat., 733; *Van Allen* v. *The Assessors,* 3 Wal., 573; *The People* v. *The Commissioners,* 4 id., 244; *National Bank* v. *The Commonwealth,* 9 id., 353; *Thompson* v. *Pacific R. R.,* id., 579.) The limit of the forfeiture for usury being declared, the rule that a contract prohibited by statute does not apply. (*Benton* v. *Port Jackson,* 17 Barb., 397; *Griffith* v. *Wells,* 3 Denio, 226.) When a statute confers a right, and prescribes adequate means of protecting it, the proprietor of the right is confined to the statutory remedy. (*Dudley* v. *Mayhew,* 3 N. Y., 9; *Smith* v. *Lockwood,* 13 Barb., 209.) The act of congress and of the State being in conflict, the former must prevail. (*Livingston* v. *Harris,* 11 Wend., 329; *Harrington* v. *Trustees,* 10 id., 547.)

RAPALLO, J.   The contract on which this action is brought was made in the State of New York, and its validity depends upon the State laws, unless they are in conflict with some act of congress, passed in pursuance of the Constitution of the United States. Two questions have, therefore, been presented upon the argument:

1st. Are the provisions of the statutes of the State of New York, which declare void all contracts reserving a greater rate of interest than seven per cent per annum, and preclude the recovery thereon of either principal or interest, in conflict with section 30 of the national banking law of June 30, 1864; and,

2d. If, so far as domestic contracts with national banks are concerned, that section does purport to override the State statutes, which declare usurious contracts void, is it constitutional?

No question has been raised in the case touching the constitutionality of any other portion of the act.

The first national banking law was passed February 25, 1863 (12 Statutes at Large, 665), and the plaintiff was organized under that act. The act was, however, repealed in 1864, and the act of June 3, 1864 (13 Statutes at Large, 99), substituted in its place, and made applicable to associations organized under the former act.

The leading object of the establishment of these banks was, as expressed in the title of the act of 1864, "to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof."

The act authorizes the formation of associations for carrying on the business of banking, by any number of persons, not less than five, who shall enter into articles of association and file a certificate in the office of the comptroller of the currency, in the form prescribed by the act. They thereupon become a corporation, and on complying with certain conditions, and on the receipt of the proper authority from the comptroller of the currency, may commence the business of banking.

These associations are by the act vested with the powers usually contained in bank charters, and among others, those of having a corporate name, and by such name making contracts, suing and defending in any court of law and equity as fully as natural persons. Their capital stock is raised by individual subscription, and their business is transacted by means of the ordinary machinery of a corporation, for the benefit of the shareholders. They are required to deposit with the treasurer of the United States a certain amount of United States bonds, upon which they receive from the comptroller of the currency circulating notes to an amount not exceeding ninety per cent of the par value of the bonds deposited. These notes they are at liberty to use in carrying on the banking business for their own benefit.

Their principal office seems to be to act as vehicles for the issue and circulation of a currency based upon the credit of the government. But the government has no concern with

their business operations. The currency they issue is protected wholly independently of the result of these. They are made capable of exercising the same rights as natural persons, in making contracts, within their corporate powers, and in appearing in courts of justice. They are made subject to the supervision of the Comptroller of the currency of the United States, in respect to their internal management and affairs, but in their authorized private dealings with third parties they stand on the same footing with natural persons, and are subject to the laws of the States in which they transact their business. Their capital stock and real estate are subject to State taxation (section 41), they are subject to the jurisdiction of the State courts (section 57) and even to the visitorial powers of courts of chancery (section 54). They may be selected as depositaries of the public money, or financial agents of the government (section 45), but in so far as their private business and contracts are concerned, the act does not assume to place them upon any different footing from natural persons selected by the government for the performance of some special public function, and at the same time permitted to carry on a private business on their own account. In so far as the right to carry on their private business is essential to enable them to perform any public function authorized by the constitution, such right is doubtless protected from State interference or State prohibition. But no public character, or privilege of immunity from State laws, in respect of their private dealings, appears to have been conferred upon them. Nor does any interference with State laws seem to be embraced in the general design, save that of conferring upon these associations a corporate existence within the States, together with the power to carry on the business of banking and issuing currency therein, notwithstanding State prohibitions against that business, or conditions imposed upon its exercise. Congress has assumed to confer upon them the power of conducting that business subject to the supervision of Federal instead of State officers; but not to place the private contracts which they may make within

the States on any different footing from those made within the same States by banks chartered by them, or by other persons capable of contracting.

This view is sustained by the opinion of the Supreme Court of the United States in the case of *The National Bank* v. *Commonwealth* (9 Wall., 362), where it is said of these banks: " They are subject to the laws of the States, and are governed in their daily course of business far more by the laws of the State than of the Union. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debt, are all governed by State law. It is only when a State law incapacitates them from discharging their duties to the government that it becomes unconstitutional."

Such, then, being the general scheme of the act, none of its subordinate provisions should be construed to exempt contracts made by these corporations from the operation of a particular State law, unless the intention to do so is so clearly apparent as to leave no room for doubt. If, by any reasonable construction, the provision now in question can be harmonized with the law of the State, that construction should be adopted.

The section (sec. 30, of act of June 3, 1864, 13 Statutes at Large, 9) is in these words :

" Section 30.   And be it further enacted, that every association may take, receive, reserve and charge on any loan or discount made, or upon any note, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State or Territory where the bank is located, and no more, except that where by the laws of any State a different rate is limited for banks of issue, organized under State laws, the rate so limited shall be allowed for associations organized in any such State under this act. And when no rate is fixed by the laws of the State or Territory, the bank may take, receive, reserve or charge a rate not exceeding seven per centum, and such interest may be taken in advance, reckoning the days

for which the note, bill or other evidence of debt has to run. And the knowingly taking, receiving, reserving or charging a rate of interest greater than aforesaid shall be held and adjudged a forfeiture of the entire interest which the note, bill or other evidence of debt carries with it, or which has been agreed to be paid thereon, and in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back, in any action of debt, twice the amount of the interest thus paid from the association taking or receiving the same. Provided, that such action is commenced within two years from the time the usurious transaction occurred. But the purchase, discount or sale at not more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest."

The construction of this section, so far as relates to the point now under consideration, depends wholly upon the meaning to be attached to the words, "*a rate of interest greater than aforesaid,*" in the third sentence of the section. If those words relate as well to the rates allowed by the laws of the States or Territories where the banks may be located, as to the rate prescribed by the act in States and Territories wherein no rate is fixed by law, then it is sufficiently clear that the consequence of taking a greater rate in either case is limited by the act to a forfeiture of the interest. But if we should come to the conclusion that those words were used with reference only to the rate prescribed in the sentence immediately preceding them, it is equally clear that the succeeding provisions have no relation to contracts made in States where the rate of interest is regulated by law.

The grammatical construction of the section is such as to admit of either construction and to leave the meaning to be ascertained from the general scheme of the act and frame of the entire section; and from these we think the intention may fairly be gathered, of leaving all contracts, made in States and Territories where usury laws exist, to be dealt with according to those laws, and at the

same time to impose restrictions upon the corporations about to be created in respect to the rate of interest which they may charge in those States and Territories whose internal policy is such as to leave the subject of interest on money free from legislative regulation.

In respect to dealings of the national banks in those States, it was evidently deemed by congress impolitic to intrust the national banks with the unrestricted liberty in regard to interest which they would have enjoyed under the State laws. Congress, therefore, prescribed a specific rate to which the banks should be limited in those States; and there being no State laws upon the subject, it was necessary to accompany this limitation of corporate power with the qualifications and explanations which usually prevail, or in the opinion of congress ought to prevail, in States where usury laws exist, and also to enforce the limitation by suitable penalties. But neither the rates of interest, nor the rules for determining what constitutes usury, in the States where usury laws exist, seem to have been intended by congress to be affected by this section. For instance, the question whether on the discount of a note, the taking of interest in advance shall constitute usury, is settled by the act with reference to banks located in States having no usury laws, but in others the banks are left subject to the operation of the State laws or decisions. The same sentence in which the banks are restricted to seven per cent in States where no rate is fixed by law, declares that such interest may be taken in advance. It is obvious, from the mere reading of the sentence in which they occur, that the words "such interest" refer only to the interest chargeable in States having no usury laws, and that the permission to take it in advance was not intended to apply, and would not avail, in a State whose decisions or laws did not permit it. The very next sentence is the one upon which this controversy arises. It declares the consequences of taking a rate *"greater than aforesaid."* These words do not necessarily include the rates fixed by State laws, but are fully satisfied by being construed as referring to the rate of seven per

cent, taken in advance, which is authorized by the sentence immediately preceding.

When congress was framing a usury law for the restraint of the banks in States having no such laws, it was appropriate that it should contain all these provisions; but to construe the act as undertaking to remodel the usury laws of the States would, besides other grave objections, be inconsistent with the manifest purpose of the act to subject the banks to the local policy, on the subject of the interest of money, of those States where interest was regulated by law.

The most rational construction of the section seems to us to be that all the provisions of the section which follow the one fixing a rate of interest, where none is fixed by law, including the clause which provides for a forfeiture of the interest only, in case of exceeding the rate authorized, are applicable only in States and Territories where there are no usury laws, and the rates which the banks may charge are fixed by the act of congress. Those provisions explain and enforce a restriction imposed by congress upon corporations of its own creation, and do not conflict with any State law.

The act of 1863 contained a provision (section 46) restricting the banks to the rates of interest established by the State laws for delay in payment in the absence of any contract, and for exceeding such rates the act declared the debt forfeited. This was a restriction upon the powers of the banks, which might deprive them of a right of action which the State laws would recognize, and was very different from a provision which should allow them to recover upon a contract which the law of the State declared void. It throws no light on the present investigation.

Assuming, however, that the true construction of section 30 of the act of 1864 is, that in all the States the national banks may recover upon usurious contracts, to the extent of the principal, notwithstanding State laws to the contrary, then the further question arises of the constitutionality of such a provision. That question also has a bearing upon the question of construction, for if such an interpretation would ren-

der it unconstitutional, that is another strong ground for rejecting it, if possible.

The power of legislating upon the subject of the validity of private contracts made within the States has not been granted by the Constitution to the general government, but has ever rested with the States. Each one of them, according to its own notions of policy, and without regard to the views of the others, has the right to prohibit and declare invalid, within its own borders, those contracts which it deems opposed to public morals or the welfare of its citizens. Each State had this right before the formation of the general government and it has never been surrendered. When the people of all the States united in framing that government they carefully defined its powers, reserving to each State, not merely its separate organization, but its sovereignty over its domestic affairs, granting to the general government only the express powers enumerated in its written charter, together with authority to pass all laws necessary and proper for the execution of those enumerated powers, and in this form was the Constitution ratified by the States.

If, for the execution of any express power vested in the federal government, it should become necessary to sanction or prohibit a particular class of contracts, in opposition to the laws of the State where made, such a measure would not derive its validity from any power of congress to legislate upon the subject of domestic contracts, but solely from the relation of the measure to the express power in execution of which it was employed, and the existence of such relation is a judicial question. In such a case the legislation of the State could be made to yield to that of the general government, only to the extent to which the former constituted an obstruction to the accomplishment of the legitimate constitutional end which congress had in view.

Chief Justice Chase, in the *License Tax Cases* (5 Wall., 470, 471), speaking of the internal commerce of the States, says: " Over this commerce and trade congress has no power of

regulation nor any direct control. No interference by congress with the business of citizens transacted within a State is warranted by the constitution, except such as is strictly incidental to the exercise of powers clearly granted to the national legislature." And in the case of *The National Bank* v. *Commonwealth* (9 Wall., 362), it is said that "the agencies of the federal government are only exempted from State legislation so far as that legislation may interfere with or impair their efficiency in performing the functions by which they are designed to serve that government. Any other rule would convert a principle founded alone in the necessity of securing to the government of the United States the means of exercising its legitimate powers into an unauthorized and unjustifiable invasion of the rights of the States."

Now, to apply these familiar principles to the case in hand. These banks are created on the theory that they are agents of the government for the accomplishment of certain purposes authorized by the constitution. That to enable them to perform their functions, it is necessary that they should have the power of transacting within the States a general banking business on their own account. It is only upon the theory that this power of transacting banking business is essential to enable them to perform their functions for the government, that the granting of such a power by congress can be sustained.

The power to create a corporation as an appropriate instrument for the execution of a constitutional power, does not carry with it authority to confer upon that corporation unlimited privileges or immunities from State law, but only such as are necessary to enable it to effect the legitimate national objects for which it is created. Speaking of this power of private dealing, which was contained in the charter of the National Bank of 1816, Chief Justice MARSHALL says : " Why is it that congress can incorporate or create a bank ? It is an instrument which is 'necessary and proper' for carrying on the fiscal operations of government. Can this instrument, on any rational calculation, effect its object unless it be

endowed with that faculty of lending and dealing in money which is conferred by its charter? If it can, if it be as competent to the purposes of government without as with this faculty, there will be much difficulty in sustaining that essential part of the charter." (*Osborn* v. *Bank of United States,* 9 Wheat., 861.)

Now, if it had been necessary or proper, for the purpose of enabling these banks to effect their national objects, that they should have power to charge interest in excess of the rates allowed by the States where they should be located, and congress had accordingly conferred it, and it were held to be a valid power, then all State laws which impose penalties for exceeding those rates, or obstructed the enforcement of contracts by which they were exceeded, must give way, but solely for the reason that they would obstruct the exercise, by an agent of the government, of a power necessary to the accomplishment of a legitimate national object. But in this case congress has not undertaken to confer any such power. On the contrary, it has expressly limited the banks to the rates fixed by the States.

This is conclusive, that no national object requires that the banks should exceed them. The laws of the States, which avoid contracts in which those rates are exceeded, do not therefore obstruct or impede these agents of the government in doing anything which the public interests require that they should do, or which they are authorized to do. They affect simply their private interests and preclude them from enforcing contracts made, not in behalf of the government, but in their own private business, and which they are, by the law of their creation, not only unauthorized to make, but are expressly prohibited from making. The foundation for any congressional interference with the laws of the States, for the purpose of protecting these institutions against the consequences of making such contracts, entirely fails.

It may be that the provisions of the act of congress are more reasonable and politic than those of the State. In the opinion of many, the State laws are unduly severe, and in the

opinion of many others all laws restricting parties from agreeing upon the rate of interest are inexpedient. But these considerations would not authorize congress to intervene, either directly or indirectly, by modifying State laws in favor of the agents of the government in their private transactions, when the State laws do not interfere with any functions which these agents were to perform for the government. It is not competent for congress to say, in the same breath, " the duties which our agent is to perform for the government require only that he should be permitted to transact his own business for his own benefit, in accordance with the same laws which govern citizens or corporations of the State, but as some of the State laws are in our judgment too harsh in prescribing the consequences of their violation, we will modify them in our agent's behalf in that respect."

There would be no more logic in this than in an act which should modify the criminal law of a State in favor of a government officer who should commit a crime while acting outside of his official duty.

It is a delicate and responsible task to endeavor to draw the line between the powers of the general and State governments, especially when the implied powers of the former are invoked. But when a case involving such an inquiry is in a regular and legal manner presented to a court for adjudication, it has no alternative but to decide it. In doing so, great care should be taken not to adopt too contracted a view of the incidental powers necessary for the proper exercise of the functions of the national government, upon which we rely for protection in our external relations and the intercourse between the States. But equal care should be exercised not to sustain an undue extension of those powers by resorting to over-strained and fanciful relations, for the purpose of connecting matters which in fact appertain to the internal commerce or affairs of the States with national objects, and thus undermining that independence of the States in respect to their domestic concerns which is reserved

to them by the Constitution, and was one of the essential conditions of the union.

The durability of the existing national organization must depend upon the good faith with which control is accorded to each department within its own sphere, and encroachments by either upon the other are avoided. Efforts to hamper or obstruct the national government in the exercise of its legitimate functions, or to extend its authority beyond its proper limits, are alike violations of the Constitution, and perilous to the true interests of the nation. To license individuals or self-constituted corporations, wielding large capitals and scattered throughout the land, to transact business in the States, free from the operation of the laws governing their domestic commerce, especially in the absence of any authorized national object to which the granting of such an exemption is a necessary auxiliary, would, in our judgment, be so manifest an excess of the power confided to the national legislature, as to require that the enactment be pronounced unconstitutional.

According to what seems to us the proper construction, no such excess of power has been attempted in the section under consideration. But, whichever construction be finally adopted, our conclusion is that the defense of usury under the laws of the State of New York was available to the defendants in this action, and that, therefore, the judgment appealed from should be reversed.

A new trial should also be ordered, with costs to abide the event.

All concur.

Judgment reversed.