<sup>Aug. 13,</sup><sub>1875.</sub> }            FIRST NATIONAL BANK v. PETERBOROUGH.

*Surplus capital of national banks—Power of a state to tax.*

Chapter 49, section 5, of the General Statutes, subjecting the surplus capital on hand of banking institutions to taxation, is applicable to banks organized under the act of congress establishing national banks, approved June 3, 1864—13 Stats. at Large 111—as well as to banks established by the legislature of this state.

The taxation of the surplus capital of such banks, in excess of the amount they are required by said act to carry to their surplus fund semi-annually, is not prohibited by congress, and is not an encroachment upon the constitutional powers vested in the federal government.

The taxation of such surplus by state authority is not the taxation of the means or agencies employed by the general government for the execution of its constitutional powers, but is the taxation of the property of such agents. The right to tax such property has never been surrendered by the states to the general government.

FROM HILLSBOROUGH CIRCUIT COURT.

PETITION for the abatement of tax. The following facts were agreed : In April, 1873, the selectmen of Peterborough, legally chosen and qualified, assessed, among other taxes for that year, a tax against said bank upon ten thousand dollars of its surplus, amounting to one hundred and seventy-five dollars ; that at the time of the assessment of the tax the undivided profits of the bank were more than ten thousand dollars in addition to and in excess of nine thousand six hundred and fifty-four dollars and thirteen cents, the ten per cent. of net profits required by the national currency act of the United States to be kept on hand by the bank as a surplus fund ; that before the assessment of the tax by the selectmen, they called upon the proper officers of the bank to exhibit to them an account of the surplus capital of the bank, which exhibit the bank, by their officers, refused to make, claiming that the same was not taxable property. The selectmen thereupon set down the surplus capital of the bank at ten thousand dollars, and assessed the same at the same rate as other property in town. The selectmen placed said tax with others in the hands of John H. Steele, collector of taxes in said town, for collection. Steele gave the bank notice in writing, dated November 6, 1873, requesting them to pay the tax. The bank, on February 21, 1874, presented their petition to the selectmen, recited in this bill: this petition was signed by five of the directors of the bank ;—and the selectmen refused to abate the tax in accordance with the prayer of the petition. The questions arising on the foregoing agreed statement of facts were transferred to this court by RAND, J.

*E. M. Smith* and *Morrison & Hiland*, for the plaintiffs.

*A. S. Scott*, for the defendants.

SMITH, J. By Gen. Stats., ch. 49, sec. 5, the surplus capital on hand of banking institutions is made liable to taxation, and, by ch. 50, sec. 4, it is made subject to taxation in the towns wherein such banking institutions are located. By ch. 15, sec. 1, Laws of 1868, all shares of the capital stock of banks located in this state, whether private, state, or national, are subject to be taxed at their *par value* to the owners thereof in the town in which they reside, if in this state; otherwise in the town where the bank is located. Under the statutes of this state, therefore, there is no question that the plaintiffs were properly taxed. The statute is explicit, that the surplus capital shall be taxed,—and it is admitted that the plaintiffs had a surplus in excess of the amount of net profits they were required by the act of congress to keep on hand,— if more than $10,000. The question, then, remains, whether the above cited statutes of this state are in conflict with the statutes of the United States.

The act of congress establishing national banks, approved June 3, 1864—13 Stats. at Large 111—enacts:

" SEC. 33. That the directors of any association may, semi-annually, each year, declare a dividend of so much of the net profits of the association as they shall judge expedient; but each association shall, before the declaration of a dividend, carry one tenth of its net profits of the preceding half year to its surplus fund, until the same shall amount to twenty per centum of its capital stock."

" SEC. 40. That the president and cashier of every such association shall cause to be kept a correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, and such list shall be open to the inspection of the officers authorized to collect taxes under state authority.

" SEC. 41. *Provided*, that nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person, from being included in the valuation of the personality of such person, in the assessment of taxes imposed by or under state authority, at the place where such bank is located, and not elsewhere ; but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state. *Provided further*, that the tax so imposed under the laws of any state, upon the shares of any of the associations authorized by this act, shall not exceed the rate imposed upon the shares of any of the banks organized under authority of the state where such association is located." "Provided, also, that nothing in this act shall exempt the real estate of associations from either state, county, or municipal taxes to the same extent, according to its value, as other real estate is taxed."

The supplementary act of congress, approved February 10, 1868, defines the word " place," as used in the original act, to mean " state,"

and provides that "the legislature of each state may determine and direct the *manner* and *place* of taxing all the shares of national banks located within said state, subject to the restriction that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state."

Provision is thus made by congress by which the *shares* of the stockholders in national banking associations may be taxed by authority of the states in which banks are located. No restriction is placed upon the amount of the tax that may be assessed, except that the rate shall not exceed that imposed upon similar institutions created by state authority, while the *manner* and *place* of taxing such shares is left to be determined exclusively by state legislation. Accordingly, in some states the tax is levied upon the bank itself at a certain rate per share of one hundred dollars, which has been held constitutional—*National Bank* v. *Commonwealth*, 9 Wall. 353—the bank being regarded as the vehicle or conduit through which the taxes of the several stockholders are collected. In other states the tax is assessed to the stockholder upon the *market* value of his share, by which mode the owner is taxed, indirectly, for his proportionate share of the surplus of the bank, including that part of the surplus which the bank is required to set apart whenever it declares a dividend, until the amount shall equal twenty per cent. of its capital stock. The legislature of this state, however, has enacted that the owner shall be assessed only upon the *par* value of his stock, and the bank, as such, is made subject to taxation for the surplus capital. Can the legislature thus reach indirectly what it might do directly ? There is nothing in the acts of congress that forbids it. The surplus is the exclusive property of the bank. The national government has no interest in it. It shares in none of the profits of the bank, and is responsible for none of its defaults; and it is difficult to see how the taxation of this surplus can interfere in any way with the operations of the bank as an instrument of the national government to carry its delegated powers into execution. If taxed at all, as the law of this state now stands it must be taxed as surplus. No reason is perceived why so large a sum should escape the tax which it is as able to bear, at least, as most other kinds of property. The power to tax the people and property of the several states has never been surrendered by the states to the general government. "The agencies of the Federal government are only exempted from state legislation so far as that legislation may interfere with or impair their efficiency in performing the functions by which they are designed to serve that government. Any other rule would convert a principle, founded alone in the necessity of securing to the United States the means of exercising its legitimate powers, into an unauthorized invasion of the rights of the states." *National Bank* v. *Commonwealth*, 9 Wall. 353.

" These banks are subject to the laws of the states, and are governed in their daily course of business far more by the laws of the state than of the Union. All their contracts are governed and construed by state

laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debt, are all governed by state law. It is only when a state law incapacitates them from discharging their duties to the government that it becomes unconstitutional." *Ib.* 362.

In *Bank* v. *Lamb*, 50 N. Y. 98, it is said,—"In so far as their private business and contracts are concerned, the act does not assume to place them upon any different footing from natural persons selected by the government for the performance of some special public function, and at the same time carry on a private business on their own account. In so far as the right to carry on their private business is essential to enable them to perform any public function authorized by the constitution, such right is doubtless protected from state interference or state prohibition. But no public character, or privilege of immunity from state laws in respect of their private dealings, appears to have been conferred on them."

Again, on page 104: "These banks are created on the theory that they are agents of the government for the accomplishment of certain purposes authorized by the constitution; that, to enable them to perform their functions, it is necessary that they should have the power of transacting within the states a general banking business on their own account. It is only upon the theory that this power of transacting banking business is essential to enable them to perform their functions for the government that the granting of such a power by congress can be sustained. The power to create a corporation as an appropriate instrument for the execution of a constitutional power does not carry with it authority to confer upon that corporation unlimited privileges or immunities from state law, but only such as are necessary to enable it to effect the legitimate national objects for which it is created."

Congress, in the title to the act of 1864, expressed the leading object of the establishment of these banks to be, " to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof." An important particular in which they differ from banks created by authority of this state is, that they are required to deposit with the treasurer of the United States a certain amount of United States bonds, upon which they receive bills or notes to an amount not exceeding 90 per cent. of the par value of the bonds deposited, which they may circulate as currency for their own benefit. "Their principal office seems to be to act as vehicles for the issue of a currency based upon the credit of the government. But the government has no concern with their business operations. The currency they issue is protected wholly independently of the result of these." *Bank* v. *Lamb*, *supra*, 97, 98. The accumulation of a surplus in excess of the amount required by statute is a voluntary matter on the part of the bank. It is neither forbidden nor required by the statute. Its net earnings in excess of the amount required to be set aside as a surplus fund, may be divided among the stockholders. If so

divided, it of course becomes the absolute property of the stockholders, but until so divided their interest in the same is only contingent, but the fund, while undivided, tends to increase the market value of their shares. The neglect to divide the net earnings to the extent allowed by law can in no way defeat or obstruct or affect the object which the government had in view in the establishment of these banks. The only effect of the neglect to divide such earnings is to increase the strength and efficiency of the bank, and thereby more certainly accomplish the object of its establishment. The surplus, to the extent above named, being then a matter wholly outside the requirements of the statute, and in no way impairing or defeating the object of establishing such agencies of the national government, but having, on the contrary, rather the opposite effect, and the surplus being the exclusive property of the bank, subject to its unrestricted control, I see no reason why the state, in the exercise of a power which it never surrendered to the national government, to wit, that of taxing the polls and estates within its limits, cannot provide for the taxation of the surplus earnings of the national banks located within its borders to the extent above named. It is only doing directly what it has undoubtedly the right to do indirectly, as has before been remarked, if it should see fit to enact that the shares of such banks should be taxed at their market instead of at their par value.

In *National Bank* v. *Commonwealth*, 9 Wall. 353, it was held that the doctrine which exempts the instrumentalities of the federal government from the influence of state legislation is not founded on any express provision of the constitution, but in the implied necessity for the use of such instruments by the federal government; and that such doctrine is therefore limited by the principle that state legislation, which does not impair the usefulness or capability of such instruments to serve that government, is not within the rule of prohibition.

In *Thomson* v. *Pacific Railroad*, 9 Wall. 591, Mr. Chief Justice CHASE remarks as follows : " We fully recognize the soundness of the doctrine that no state has a ' right to tax the means employed by the government of the Union for the execution of its powers.' But we think there is a clear distinction between the means employed by the government, and the property of agents employed by the government. Taxation of the agency is taxation of the means ; taxation of the property of the agent is not always or generally taxation of the means.

" No one questions that the power to tax all property, business, and persons, within their respective limits, is original in the states, and has never been surrendered. It cannot be so used, indeed, as to defeat or hinder the operations of the national government; but it will be safe to conclude, in general, in reference to persons and state corporations employed in government service, that when congress has not interposed to protect their property from state taxation, such taxation is not obnoxious to that objection." *Lane County* v. *Oregon*, 7 Wall. 77.

In *Railroad Company* v. *Peniston*, 18 Wall. 33, it is said,—" It may, therefore, be considered as settled, that no constitutional implica-

tions prohibit a state tax upon the property of an agent of the government, merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the states in the collection of their necessary revenue, without any corresponding advantage to the United States. A very large proportion of the property within the states is employed in execution of the powers of the government. It belongs to governmental agents, and it is not only used, but it is necessary for their agencies. United States mails, troops, and munitions of war are carried upon almost every railroad. Telegraph lines are employed in the national service. So are steamboats, barges, stage-coaches, foundries, shipyards, and multitudes of manufacturing establishments. They are the property of natural persons, or of corporations, who are instruments or agents of the general government, and they are the hands by which the objects of the government are attained. Were they exempt from liability to contribute to the revenue of the states, it is manifest the state governments would be paralyzed. While it is of the utmost importance that all the powers vested by the constitution of the United States in the general government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that state taxation of such property is impliedly prohibited."

It seems to me to be abundantly settled, both upon authority and principle, that the states, under the existing legislation by congress, have the unquestionable right to tax the surplus earnings of national banks within their limits, to the extent attempted in the case now before us. The services which these banks render to the government are only an incident to their general business. Their operations are only accidentally, not incidentally, connected with those of the government. Their efficiency to discharge their duties is not impaired by the taxation complained of; their property only, and not their operations, is subjected to taxation; and it is eminently just and reasonable that these institutions should bear their proportion of a common burden, in order that the state may throw around these institutions, as well as all others, and around all its subjects, protection to life and property.

CUSHING, C. J. Those portions of the statutes of the United States and of this state, which are involved in this case, are sufficiently cited in the opinion of my brother SMITH, and it is therefore unnecessary to cite them again.

Are these provisions in the law of the United States and in the law of the state in conflict with each other? and are they so in conflict that the law of New Hampshire cannot be enforced?

It is conceded in this case that the par value of the shares is much less then their actual value. What might be the construction if there were no surplus, and the shares were below par, is not now necessary to be considered.

The legislature of New Hampshire has, for reasons satisfactory to those whom it represents, provided that a certain portion of banking

capital shall be taxed to the stockholders in the towns where they live, and a certain other portion in the towns where the banks are located. It is probable that there are satisfactory reasons why this should be so. It seems reasonable that banking corporations should contribute something towards the expenses of those towns of whose institutions and governmental arrangements, police and otherwise, they have the benefit. This might be effected by taxing the shares at their par value to the owners in the towns where they reside, and the excess over the par value of each share due to the surplus capital proposed to be taxed, to the owners in the towns where the banks are located. This would be exactly within the terms of the U. S. statute, and would be, as it seems to me, entirely unobjectionable. If, now, it were further provided that this tax on these shares should be paid by the bank, and charged to each shareholder's account, this would obviously be a very great convenience, would be entirely consistent with the law, and, I think, could not in any way be objected to. *National Bank* v. *Commonwealth*, 9 Wall. 353.

Now, the surplus capital proposed to be taxed is precisely the aggregate of the values above par of all the shares due to that surplus, and the dividends payable to each stockholder are precisely the profits not reserved divided by the whole number of shares. If, then, the surplus capital is taxed in one sum to the bank, and paid by the bank out of its profits, precisely the same result would be produced, excepting in a more convenient and less expensive form. All the shares would be taxed exactly as before, each share would bear the same sum, the same amount would be taken out of the fund for division, and each shareholder's dividend would be diminished by the exact amount of his tax. Identically the same result would be produced as if the statute had been more literally followed, the only difference being that in this mode the shares are taxed to all the shareholders by the name of their association.

In this nutshell lies the whole question. The result produced by this mode of taxation is demonstrably exactly the same. Can the state do, in this slightly indirect mode, what it is conceded they may do directly? It appears to me that the objection is untenable, and a very poor kind of word-catching.

It may also be remarked, that, in so far as the objection founded on any supposed interference with a government agent is concerned, it cannot possibly make any difference whether any surplus capital should be taxed to each shareholder by increasing the appraisal of his stock, or to the shareholders all together by their corporate name. The statute expressly authorizes doing it in the first mode.

The supreme court of the United States is of course the tribunal of last resort. I know of no case which has yet been decided, involving the exact point presented by this case. As at present advised, I find no difficulty in agreeing to the results which the court has reached.

LADD, J. I am also of opinion, that the statute under which this

tax was assessed is not in conflict with the constitution or any law of the United States. The property upon which it was laid consists of the earnings and income of shares in a national bank, which the bank voluntarily reserved in excess of the surplus required to be kept on hand by the act of congress. It was not capital of the bank, within the meaning of the laws of the United States, as interpreted and applied by the supreme court in repeated decisions since the passage of the act under which the bank was established, but simply a fund which the bank might legally have divided and paid over to the owners of its stock, in the way of dividends, but which it chose rather to retain for the purpose of enlarging and facilitating the transaction of its business. It was tangible property, situated within our territorial limits, entitled, as much as the property of any other citizen, to the full protection of our municipal laws; and it is not easy to imagine any just reason why it should not be charged with its due and equal proportion of the burden of maintaining and administering those laws.

It has not, indeed, been claimed by counsel for the bank that this surplus is not in some form a legal and proper object of state taxation. But the objection is, that the mode in which the legislature have undertaken to reach it is not warranted by the constitution, or authorized by the act of congress under which the bank was established; that it should have been levied by the name of a tax upon shares instead of a tax against the bank by name; that the true construction of the constitution and act of congress forbids a state tax of any kind, except upon real estate to be assessed against a bank created by act of congress, as an agent in the administration of the national finances.

It seems to me, such a construction can only be sustained by sticking very closely to a somewhat narrow interpretation of the letter of the act, and disregarding altogether the spirit and purpose of both the act and the constitution of the United States. The broad reason, upon which it was held, in *McCullock* v. *Maryland,* 4 Wheat. 316, that state governments have no right to tax any of the constitutional means employed by the government of the Union to execute its constitutional powers any further than such right may be given by the act creating the agency, and so that a state, within which a branch of the bank of the United States had been established, could not, constitutionally, tax that branch, was said by Chief Justice MARSHALL to rest upon three very plain abstract propositions: (1) That a power to create implies a power to preserve; (2) that a power to destroy, if wielded by a different hand, is hostile to and incompatible with these powers to create and preserve; (3) that where this repugnancy exists, that authority which is supreme must control, not yield to, that over which it is supreme. The power of congress to create and continue a bank having been established in a preceding part of the opinion, he remarks that it is too obvious to be denied that the power of taxing it by the states may be exercised so as to destroy it: hence the conclusion that such power to tax does not exist in the states.

In the present case the legislature have left untouched the capital of

the association, nor has there been any attempt to tax that portion of the earnings of its shares which the bank was required to set aside as a surplus for the greater security both of the government and the people. It is perfectly obvious that the levying of this tax does not touch the institution at any point where it is shielded from state taxation by the reasons upon which *McCulloch* v. *Maryland,* and the numerous cases following it, are placed. It is not taxing an instrument or agent of the government for property which, by the act creating it, is in any way made part of the plan of its existence, or the basis of its operations.

But it is argued that the case of *Van Allen* v. *The Assessors,* 3 Wall. 573, establishes the doctrine, that although this property was legally subject to taxation by the state, still, inasmuch as the legislature have directed it to be assessed against the bank instead of the stockholders individually, our statute must be held void as being repugnant to the law of congress which allows the shares only to be taxed. I do not think the case goes that length. The main question there discussed was, whether the shares of a national bank could be taxed at all by state authority, except for what remained of their value after deducting the national securities in which part or the whole of the capital of such bank was invested; and it was held that they might be thus taxed. It was further held, that a statute of the state of New York laying a tax upon shares in such banks, which contained no provision that such tax should not exceed the tax upon shares in state banks, could not be upheld. If there were any doubt, however, as to the doctrine of that case, it certainly seems to be quite removed by the later case of *National Bank* v. *Commonwealth,* 9 Wall. 353; and, as this case seems to me decisive of the present, it will be necessary to examine it somewhat at length.

It was error to the court of appeals of Kentucky. A statute of that state lays a tax as follows: "On bank stock, or stock in any moneyed corporation of loan or discount, fifty cents on each share thereof equal to one hundred dollars, or on each one hundred dollars of stock therein owned by individuals, corporations, or societies." And the same statute goes on to enact,—"The cashier of a bank whose stock is taxed shall, on the first day of July in each year, pay into the treasury the amount of tax due. If such tax be not paid, the cashier and his sureties shall be liable for the same, and twenty per cent. upon the amount; and the said bank or corporation shall thereby forfeit the privileges of its charter."

Acting under this statute, the commonwealth demanded of the plaintiffs in error—the First National Bank of Louisville—$4,000 with interest, the sum which a tax of fifty cents per share on the shares of the bank gave.

There was judgment against the bank in the state court, and that judgment was here affirmed.

In argument, it was strenuously urged by counsel for the bank that the state had no legal or constitutional power to coerce the bank itself to pay the tax *in solido* for its stockholders; that to prevent these

organizations from being made the servants and agents of the states in the collection of taxes, thus clothing the state with an authority not justified by the constitution, congress had particularly prescribed the *mode* of collection, as well as the extent of it.

Mr. Justice MILLER delivered the unanimous judgment of the court, in the course of which he says:

" It is strongly urged that it is to be deemed a tax on the capital of the bank, because the law requires the officers of the bank to pay this tax on the shares of its stockholders. Whether the state has the right to do this we will presently consider, but the fact that it has attempted to do it does not prove that the tax is anything else than a tax on these shares. It has been the practice of many of the states, for a long time, to require of its corporations thus to pay the tax levied on their share-holders. It is the common if not the only mode of doing this in all the New England states; and in several of them the portion of this tax, which should properly go as the shareholders' contribution to local or municipal taxation, is thus collected by the state, of the bank, and paid over to the local municipal authorities.     *     *     *     But it is argued that the banks, being instrumentalities of the federal government, by which some of its important operations are conducted, cannot be subjected to such state legislation.     *     *     *     The most important agents of the federal government are its officers; but no one will contend that when a man becomes an officer of the government he ceases to be subject to the laws of the state. The principle we are discussing has its limitation, a limitation growing out of the necessity on which the principle itself is founded. That limitation is, that the agencies of the federal government are only exempted from state legislation so far as that legislation may interfere with, or impair their efficiency in performing, the functions by which they are designed to serve that government. Any other rule would convert a principle, founded alone in securing to the government of the United States the means of exercising its legitimate powers, into an unauthorized and unjustifiable invasion of the rights of the states. The salary of a federal officer may not be taxed; he may be exempted from any personal service which interferes with the discharge of his official duties, because those exemptions are essential to enable him to perform those duties. But he is subject to all the laws of the state which affect his family or social relations, or his property, and he is liable to punishment for crime, though that punishment be imprisonment or death. So of the banks. They are subject to the laws of the state, and are governed in their daily course of business far more by the laws of the state than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.     *     *

" A very nice criticism of the proviso to the 41st section of the national bank act, which permits the states to tax the shares of such

bank, is made to us to show that the tax must be collected of the share-holder directly, and that the mode we have been considering is by implication forbidden. But we are of opinion, that while congress intended to limit state taxation to the shares of the bank, as distinguished from its capital, and to provide against a discrimination in taxing such bank shares unfavorable to them, as compared with the shares of other corporations and with other moneyed capital, it did not intend to prescribe to the states the mode in which the tax should be collected. The mode under consideration is the one which congress itself has adopted in collecting its tax on dividends, and on the income arising from bonds of corporations. It is the only mode which, certainly and without loss, secures the payment of the tax on all the shares, resident or non-resident; and, as we have already stated it, it is the mode which experience has justified in the New England states as the most convenient and proper, in regard to the numerous wealthy corporations of those states. It is not to be readily inferred, therefore, that congress intended to prohibit this mode of collecting a tax which they expressly permitted the states to levy."

Now let us see how this reasoning applies to the case before us. By sec. 1, ch. 15, Laws of 1868, " all shares of the capital stock of the banks located in this state, whether private, state, or national, shall be taxed at their par value to the owners thereof, in the town in which they reside, if in this state," &c. By sec. 4, ch. 50, Gen. Stats., an act which had been in force for many years in this state when the national bank act was passed, " the surplus capital on hand in banking institutions shall be taxed in the towns wherein such banking institutions are located;" and to prevent the possibility of wrong from thus separating what might perhaps well enough be treated as a single interest, it is expressly provided that " no statute provision shall be so construed as to subject any stock to double taxation." Gen. Stats., chap. 49, sec. 7.

It is not pretended that there is any double taxation here, nor is it claimed but that this surplus voluntarily reserved by the bank, beyond what it is required by the act of congress to retain, enhances the value of the shares just as directly as though it were actually divided and added to the shares by some act of the bank. That is, the shares represent the interest of their owners in this surplus, just as much as they do the interest of the shareholders in the capital stock and property of the bank, which is made exempt from state taxation by the federal law. To continue : so far as might be consistent with the full operation of the new system, established by the national legislature, a mode of taxation to which our people from long use had become accustomed, and thus provide that the great change made in the currency of the country by the national bank act should go into effect with as little friction as possible, our legislature did not change the law of the state in this regard, but still continued to towns in which a bank may be situated the right to tax this surplus as property located within their corporate limits, instead of treating the surplus as an increment to the

shares, which it really is, and dividing the tax upon it among the various towns where the shares are owned. Most clearly it is a tax upon value, represented by the shares. In substance, it is a tax upon the shares and nothing else. The only difference is, that by our statute it is to be paid out of funds, the beneficial ownership of which is in the shareholders, by the hand of the bank, whereas, if it were assessed upon the shareholders individually, it would be paid by them directly without the intervention of the bank. The legal title to the money may be in the corporation until it is divided and handed over to the stockholders, but this legal ownership is of no higher character than that of a trustee for the owners of the shares; and, in reality, it is only by consent of the share-owners that the surplus is not distributed to them.

In *National Bank* v. *Commonwealth* it was held, as we have seen, that a tax upon shares might legally be levied directly against the bank. Is it to be held that a tax, which is in fact and to all practical intents upon shares, cannot be levied against the bank, merely because the legislature call it by another name, and assess it upon a surplus always definite and easy to be ascertained? I think not. See *Thomson* v. *Pacific Railroad*, 9 Wall. 579; *Railroad Company* v. *Peniston*, 18 Wall. 5. My opinion therefore is, that the case is entirely within the doctrine of *National Bank* v. *Commonwealth;* and, as this is the opinion of all the members of the court, the

*Petition must be dismissed.*