LEO SCHLESINGER, as Receiver of the FEDERAL BANK OF NEW
York, Respondent, *v.* ANDREW GILHOOLY, Appellant.

BILLS AND NOTES — VALIDITY OF USURIOUS NOTES DISCOUNTED BY
STATE BANK. Promissory notes void for usury as between the original
parties are nevertheless valid and enforceable when discounted by a state
bank for value before maturity in the due course of business, without
notice of their usurious inception.

*Schlesinger* v. *Gilhooly,* 116 App. Div. 914, affirmed.

(Argued March 11, 1907; decided June 4, 1907.)

APPEAL from a judgment, entered December 10, 1906, upon
an order of the Appellate Division of the Supreme Court in
the first judicial department overruling defendant's excep-
tions, ordered to be heard in the first instance by the Appel-
late Division, denying a motion for a new trial and directing
judgment for plaintiff on the verdict directed by the trial court.

The complaint sets forth two causes of action in favor of the
plaintiff as receiver of the Federal Bank of New York, a
domestic banking corporation, each founded on a promissory
note made by the defendant, payable to his own order. The
complaint, as amended upon the trial, alleges that each of
said notes "before maturity was indorsed by the said defend-
ant in blank and delivered to William Muirhead and was
thereafter and prior to maturity discounted by the said bank
in due course and for value."

1

The answer sets forth facts tending to show that each of said notes was made by the defendant and delivered by him to said Muirhead for a usurious consideration exacted and paid as part of a transaction relating to a loan of money; that such transaction was the first inception of both notes, and that both were void for usury when presented for discount to the Federal Bank.

Upon the trial the allegations of the complaint were admitted and all defenses waived except that of usury, whereupon the plaintiff moved that the court direct a verdict in his favor for the amount of said notes, notwithstanding the answer, on the ground that "usury is not available as a defense against a state bank." The defendant asked "to go to the jury on the facts of the case," but his application was denied and the motion of the plaintiff was granted. The exceptions taken by the defendant, when heard in the first instance by the Appellate Division, were overruled and the judgment directed from which the appellant appeals to this court.

*Ernest Hall* for appellant. Under the Usury Act a note infected with usury is rendered absolutely void and no subsequent transaction can make it valid. The vice of usury follows a promissory note into the hands of a *bona fide* holder. (*Claflin* v. *Boorum*, 122 N. Y. 385; *F. Nat. Bank* v. *Benedict*, 1 Hall, 480; *Chatham Bank* v. *Betts*, 27 N. Y. 358; *Union Bank* v. *Gilbert*, 83 Hun, 417; *Freeport Bank* v. *Hagemeyer*, 91 Hun, 194; *Union Bank* v. *Benedict*, 35 App. Div. 216.) The general and undiscriminating statute of the state of New York, in so far as it prohibits usury by an individual and renders void in the hands of every holder a note, tainted with usury taken by an individual, does not conflict with any express provision of the National Banking Act, nor does it impair the power of a national bank to perform its functions. It is, therefore, operative upon a national bank that purchases or discounts such a usurious note. (*McClellan* v. *Chipman*, 164 U. S. 347; *Nat. Bank* v.

*Commonwealth*, 9 Wall. 362; *Witters* v. *Sowles*, 32 Fed. Rep. 758; *Nat. Bank* v. *A. C. Co.*, 104 Ga. 403; *F. Bank* v. *Dearing*, 91 U. S. 29; *Davis* v. *E. S. Bank*, 161 U. S. 275; 142 N. Y. 590; *Haseltine* v. *C. Nat. Bank*, 183 U. S. 131; *Easton* v. *Iowa*, 188 U. S. 219.) Section 55 of the State Banking Law (L. 1892, ch. 689) places a state bank on an equality with a national bank only as to the rate of interest which a state bank may take and as to the penalty for the taking of usury by a state bank. (*Schlesinger* v. *Kelly*, 114 App. Div. 550; *Claflin* v. *Boorum*, 122 N. Y. 385; *F. Nat. Bank* v. *Benedict*, 1 Hall, 480; *Chatham Bank* v. *Betts*, 37 N. Y. 358; *Union Bank* v. *Gilbert*, 83 Hun, 417; *Freeport Bank* v. *Hagemeyer*, 91 Hun, 194; *Union Bank* v. *Benedict*, 35 App. Div. 216.) Sections 96 and 94 of the Negotiable Instruments Law do not repeal section 5 of the Usury Act, so far as it renders a usurious note void in the hands of a *bona fide* holder. (*Claflin* v. *Boorum*, 122 N. Y. 385; *Wilkie* v. *Rosevelt*, 3 Johns. Cas. 206; *Eastman* v. *Shaw*, 65 N. Y. 522; *Vallet* v. *Parker*, 6 Wend. 616; *Rockwell* v. *Charles*, 2 Hill, 499; Edwards on Bills [1st ed.], 369; 1 Daniel Neg. Inst. § 197; *Hollingsworth* v. *Moulton*, 53 Hun, 91; 119 N. Y. 612; *Cunningham* v. *Sanz*, 79 Hun, 434; *Bank of Kinderhook* v. *Gifford*, 40 Barb. 659; *Davis* v. *Supreme Lodge*, 165 N. Y. 166; *Matter of Curser*, 89 N. Y. 403.) The Negotiable Instruments Law is not repugnant to the statutes against usury and gaming because those acts neither relate to the same subject nor were they enacted for the same purpose. (*Davis* v. *Supreme Lodge*, 165 N. Y. 166; *Bush* v. *R. R. Co.*, 166 N. Y. 210; *Eastman* v. *Shaw*, 65 N. Y. 526.)

*George W. Glaze* for respondent. The Usury Law has been repealed by implication by the Banking Law so far as applicable to banks and private bankers. (L. 1870, ch. 163; *F. Bank* v. *Hale*, 59 N. Y. 53; *Whitehall* v. *Lamb*, 50 N. Y. 95; *F. & M. Nat. Bank* v. *Dearing*, 91 U. S. 29; *Davis* v. *E. S. Bank*, 161 U. S. 283; *McClellan* v. *Chapman*, 164 U. S.

347; *Easton* v. *Iowa*, 188 U. S. 220; *Haseltine* v. *Central Nat. Bank*, 183 U. S. 132; *Caponigri* v. *Altieri*, 165 N. Y. 255; *Hintermister* v. *F. Nat. Bank*, 64 N. Y. 214; *Bank of Monroe* v. *Finlay*, 6 Hun, 584.) The fact that the bank did not take the usury but purchased usurious paper does not change the legal effect of repeal. (*Haseltine* v. *Central Nat. Bank*, 183 U. S. 132; *Central Bank* v. *Pratt*, 115 Mass. 539; *Hintermister Case*, 64 N. Y. 214; *Bank of Monroe* v. *Finlay*, 6 Hun, 584; *Marine Bank* v. *Fiske*, 9 Hun, 363; *Atlantic State Bank* v. *Savery*, 18 Hun, 36; *Davis* v. *Supreme Lodge*, 165 N. Y. 167.) The Usury Law, so far as applicable to banks, is in conflict with the National Banking Act. (*McClellan* v. *Chapman*, 164 U. S. 347; *C. Nat. Bank* v. *Pratt*, 115 Mass. 546; *People* v. *Comrs. of Taxes*, 26 N. Y. 163.) The defenses of usury being "defenses available to the prior parties among themselves" were cut off by negotiation to the Federal Bank in due course. (*Claflin* v. *Boorum*, 122 N. Y. 385; *Heckmann* v. *Pinkney*, 81 N. Y. 211; *Cromwell* v. *MacLean*, 123 N. Y. 485; *Strickland* v. *Henry*, 66 App. Div. 23; *Wirt* v. *Stubblefield*, 17 App. Cas. [D. C.] 283; *Hamilton* v. *Fowler*, 99 Fed. Rep. 18.) The provisions of the Negotiable Instruments Law "form a system of regulations. All the parts are in harmony with each other and cover the entire subject." It, therefore, supersedes the Usury Law and repeals it by implication so far as applicable to holders in due course. (*Heckmann* v. *Pinkney*, 81 N. Y. 211; *Cromwell* v. *MacLean*, 123 N. Y. 485.) The Banking Law and the Negotiable Instruments Law being *in pari materia* must be read together and construed alike with a view to the purposes and objects thereof. (*Smith* v. *People*, 47 N. Y. 330; *People* v. *Utica Life*, 15 Johns. 358; *Rogers* v. *Bradshaw*, 20 Johns. 735; *McCarter* v. *Orphan*, 9 Cow. 437; *Rexford* v. *Knight*, 15 Barb. 629; 11 N. Y. 308; *Waterford Co.* v. *People*, 9 Barb. 161.)

VANN, J. The learned Appellate Division rendered judgment in this case on the authority of its previous decision in

*Schlesinger* v. *Kelly* (114 App. Div. 546). That case involved the same questions as the one now before us and all the justices were of the opinion that the plaintiff was entitled to recover, four of them on the ground that the usury statute of this state "has been repealed by implication so far as state banks are concerned, not only where the bank itself has been a direct participator in the usurious transaction, but also where it is an innocent holder in due course of the paper which in the hands of private parties would be void for usury in its inception." One of the justices hesitated to affirm on that ground but concurred in the result, because he thought that the Negotiable Instruments Law rendered "the defense of usury inapplicable to a *bona fide* holder of negotiable paper acquiring the same in due course."

The subject is of great importance to the business community, since it affects all banks doing business in this state, and, if the appellant is right, leaves them open to daily loss, even if they act with the utmost care and in the best of faith. The solvency of every bank, as well as the solvency of many depositors, might depend more upon accident than upon business foresight and ability, while the most scrupulous effort to obey the law would afford no protection. It was stated on the argument, as an illustration, for the fact does not appear in the record, that the makers " of more than half of the commercial paper held by the Federal Bank at the time of its failure allege an usurious origin thereof."

Without passing upon the effect of the Negotiable Instruments Law, I shall first discuss the question considered in the prevailing opinion below, to which we are much indebted. That question depends primarily upon the effect of certain sections of the Federal Banking Act, when read in connection with section 55 of our State Banking Law. We divide in judgment on that question as well as upon another, not considered below nor argued before us, which relates to the power of Congress to pass an act having the effect which I think should be given to the Federal statute.

The law of this state relating to interest and usury not only

forbids the taking of interest upon a loan of money in excess
of the rate prescribed, but also renders void all bonds, notes
and other contracts given to secure a loan made in violation
of that provision. (2 R. S. 772, §§ 2, 5; L. 1837, ch. 430,
§ 1.)

The act of Congress entitled " An act to provide a national
currency secured by a pledge of United States bonds and to
provide for the circulation and redemption thereof," approved
June third, 1864, provided that any association organized
thereunder might " take, receive, reserve and charge on any
loan or discount made, or.upon any note, bill of exchange or
other evidences of debt, interest at the rate allowed by the laws
of the state or territory where the bank is located, and no more,
except that where by the laws of any state a different rate is
limited for banks of issue organized under state laws, the rate
so limited shall be allowed for associations organized in any
such state under this act.   *   *   *   And the knowingly tak-
ing, receiving, reserving or charging a rate of interest greater
than aforesaid, shall be held and adjudged a forfeiture of
the entire interest which the note, bill or other evidence of
debt carries with it, or which has been agreed to be paid
thereon.   And in case a greater rate of interest has been paid,
the person or persons paying the same, or their legal repre-
sentatives, may recover back, in any action of debt, twice the
amount of the interest thus paid from the association taking
or receiving the same, providing that such action is com-
menced within two years from the time the usurious transac-
tion occurred."   (13 U. S. Stat. at Large, p. 108, § 30.)   This
statute was re-enacted in 1874 without substantial change,
and the section quoted now appears in two sections of the
United States Revised Statutes.   (U. S. R. S. §§ 5197 and
5198.)   Section 5197, entitled " Limitation upon rate of
interest which may be taken," embraces the first sentence
quoted from the original act, and section 5198, entitled
" Consequences of taking usurious interest," the remainder.

The Banking Law of the state of New York provides that
" Every bank and private and individual banker doing busi-

ness in this state may take, receive, reserve and charge on every loan and discount made, or upon any note, bill of exchange or other evidence of debt, interest at the rate of six per centum per annum; and such interest may be taken in advance, reckoning the days for which the note, bill or evidence of debt has to run. The knowingly taking, receiving, reserving or charging a greater rate of interest shall be held and adjudged a forfeiture of the entire interest which the note, bill or evidence of debt carries with it, or which has been agreed to be paid thereon. If a greater rate of interest has been paid, the person paying the same or his legal representatives may recover back twice the amount of the interest thus paid from the bank and private or individual banker taking or receiving the same, if such action is brought within two years from the time the excess of interest is taken. * * * The true intent and meaning of this section is to place and continue banks, and private and individual bankers on an equality in the particulars herein referred to with the national banks organized under the act of Congress, entitled 'An act to provide a national currency secured by pledges of United States bonds and to provide for the circulation and redemption, thereof,' approved June the third, eighteen hundred and sixty-four." (L. 1870, ch. 163; L. 1892, ch. 689, § 55, as amended by L. 1900, ch. 310, § 1.) This part of the statute needs no construction, and no argument is required to unfold its controlling purpose, which, as the simple reading shows, was to place state banks on an absolute equality with national banks, so far as the subject of usury is concerned, in order to prevent state banks from being driven out of business, for capital goes where there is the least risk. It does not occur to me how that object could be made plainer, and the criticism of more than thirty years or more since the pioneer act of 1870 was passed seems to have raised no serious doubt in that respect.

The notes in question were void as between the original parties thereto, and they would have continued void in the hands of any individual to whom they might have been trans-

ferred. (*Claflin* v. *Boorum*, 122 N. Y. 385; Webb on Usury, § 308.) Whether they were void in the hands of the Federal Bank, after it had discounted them for value before maturity and in due course, depends upon the effect of the statutes above set forth. If they leave the original usury law of this state in full force with reference to a note taken by a state bank under such circumstances, doubt is cast upon every piece of commercial paper made by one person and indorsed by another that is presented to a bank for discount. This would be a serious result and would carry confusion into all channels of trade, but if such is the law it must be obeyed. If, on the other hand, the old act against usury, which once applied to all loans made and payable in this state, has been so modified as to take its stifling grasp from promissory notes discounted by a bank under the circumstances named, banking business may still be carried on in this state, as it is in others, without undue exposure to loss.

What have the courts said with reference to the subject?

The first case bearing upon the question that was considered by this court after the National Banking Act of 1864 was passed was decided in 1872, but as the plaintiff in that case was a national bank there was no occasion to consider the effect of the act of 1870. (*First National Bank of White-hall* v. *Lamb*, 50 N. Y. 95.) The National Banking Act, however, was considered and it was held to confer no immunity from the usury laws of the state and that a contract for a loan made in this state with a national bank by which interest at a rate in excess of the one then prescribed by law was reserved was illegal and void. It was further held that the provision of section thirty, limiting the forfeiture to interest, referred only to the preceding sentence which fixed a rate of interest in those states and territories where none was fixed by local law.

The next case, decided in 1874, presented the same question with reference to a state bank. The act of 1870 was considered and it was held to have "the effect of giving the state banks the same rights and privileges and making them

subject to the same forfeitures in respect to taking usury as the national banks have under the act of Congress;" that as this court had held that national banks, notwithstanding the national act, were subject to the usury laws of the state, the provision of the state act relating to equality of rights required that state banks should be governed by the same rule and held subject to the same forfeiture. (*Farmers' Bank of Fayetteville* v. *Hale,* 59 N. Y. 53.)

The law, as thus laid down, was regarded as settled in this state until 1875, when the provisions of the National Banking Act relating to the subject were presented for consideration by the Supreme Court of the United States. A case arose in this state which involved the question whether national banks are subject to the usury laws of the states in which they are located. When decided by this court it was held that they were, in accordance with our previous decisions, but on error to the Supreme Court of the United States our judgment was reversed, all the justices concurring. (*Farmers & Mechanics' Nat. Bank of Buffalo* v. *Dearing,* 59 N. Y. 659 ; 91 U. S. 29.)

Mr. Justice Swayne, speaking for the court, after referring to the provisions of the act of 1864, said : "These clauses, examined by their own light, seem to us too clear to admit of doubt as to anything to which they relate. They form a *system of regulations.* All the parts are in harmony with each other, and *cover the entire* subject. \* \* \* In any view that can be taken of the thirtieth section, the power to supplement it by state legislation is conferred neither expressly nor by implication. There is nothing which gives support to such a suggestion. There was reason why the rate of interest should be governed by the law of the state where the bank is situated ; but there is none why usury should be visited with a forfeiture of the entire debt in one state, and with no penal consequence whatever in another. This, we think, would be unreason, and contrary to the manifest intent of Congress. Where a statute prescribes a rate of interest, and simply forbids the taking of more, and more is contracted for, the contract is good for what might be lawfully taken, and void only

as to the excess. \* \* \* The thirtieth section is remedial as well as penal, and is to be liberally construed to effect the object which Congress had in view in enacting it. (*Gray* v. *Bennett*, 3 Met. 522.) \* \* \* This section has been elaborately considered by the highest court of Massachusetts, of Pennsylvania, of Ohio and of Indiana. (*Davis, Receiver,* v. *Randall,* 115 Mass. 547; *Central Nat. Bank* v. *Pratt,* Id. 539; *Brown* v. *Second Nat. Bank of Erie,* 72 Penn. St. 209; *First Nat. Bank of Columbus* v. *Garlinghouse,* 22 Ohio St. 492; *Wiley* v. *Starbuck,* 44 Ind. 298.) In all these cases, views were expressed in conflict with those maintained in *The First Nat. Bank of Whitehall* v. *Lamb,* 50 N. Y. 100. This adjudication controlled the result of the litigation between these parties. Upon reason and authority, we have no hesitation in coming to the conclusion that there is error in the case before us."

The importance of this decision justifies the elaborate quotations I have made and shall make hereafter, for they are necessary in order to appreciate the theory as well as the result. It bears directly and with controlling force not only upon the question I am now discussing, but also upon the question soon to be considered. There was no limitation to the decision as made and none has since been applied. It is still regarded as in full force by the court that made it, which, after citing it as recently as 1901, said: " In that case it was held that a law of New York forfeiting the entire debt for usury was superseded by the National Banking Law, and such law was only to be regarded in determining the penalty for usury." (*Haseltine* v. *Central Bank of Springfield,* 183 U. S. 132, 134.)

The court held in the *Dearing* case, as I read the opinion, that the National Banking Act forms "a system of regulations" and covers "the entire subject" of usury, as applied to national banks; that such banks, as instruments of the general government, cannot be controlled nor their operations in any wise affected by state laws, "except in so far as Congress may see proper to permit;" that even taxation, unless author-

ized by Congress, is powerless against them; that the policy
of the nation with reference to its banks, including the sub-
ject of usury so far as it affects them, when once declared by
its legislature, is exclusive, and cannot be thwarted by state
legislation; that "whenever the will of the nation intervenes
exclusively" with reference to a subject under its control "the
authority of the state retires;" that there is no reason "why
usury should be visited with the forfeiture of the entire debt
in one state and with no penal consequences whatever in
another," and that such a result would be "contrary to the
manifest intent of Congress;" that as the act of 1864 "cre-
ates a new offense and denounces the penalty," such penalty
is exclusive; and, finally, in substance, that state laws against
usury, so far as they affect national banks, are suspended and
in abeyance until Congress permits their enforcement.

The exclusive intent and effect of the National Banking
Act was also recognized in *Schuyler Nat. Bank* v. *Gadsden*
(191 U. S. 451, 456) and *Burnet* v. *Nat. Bank* (98 U. S. 555,
558). For a large number of cases to the same effect decided
by state courts, see 5 Fed. Statutes, 131, 133, etc., notes.

While the exact question before us was not presented in the
*Dearing* case, the principle that national banks are not subject
to state legislation without the permission of Congress, and
that the National Banking Act covers the entire subject of
usury and forfeitures therefor, so far as such banks are con-
cerned, when considered in connection with the parity clause
of our State Banking Act, necessarily controls the decision of
this case. If that decision was right the judgment under
review cannot be wrong.

Congress said in effect: "In creating national banks as
national agencies, we subject them to the forfeiture of inter-
est only on account of usury and we make this the sole rule
on that subject, to the exclusion of all state laws with their
diverse regulations, as applied to said banks." Our state legis-
lature then said in substance: "In order to place state banks
on a parity with national banks we enact the same law upon the
subject of usury as applied to the former that Congress has

enacted on that subject as applied to the latter." This court recognized the logical result when it expressly overruled its previous decisions in the *Lamb* and *Hale* cases and said: "But by the authoritative decision of the court at Washington, the act of Congress receiving a different interpretation from that which we thought it would bear, it follows that in order to give effect to the evident intention of the legislature of this state, the statute enacted in 1870 to put the state banks upon an equality with the national banks should have the same interpretation and effect as is given to the act of Congress. Any other interpretation would do violence to the clearly expressed will of the legislature, do injustice to the state institutions and give undue effect to the legislation of Congress so far as it is hostile to the state banks." (*Hinter-meister* v. *First National Bank of Chittenango*, 64 N. Y. 212, 214.) While the bank itself took the usury in that case the judgment rested on the controlling principle of the *Dearing* case that the Federal act excluded all penalties for usury except those provided thereby. It was held that section 1 of the act of 1870 was operative and superseded the usury law and that the position taken in the *Lamb* case that the parity clause in the second section limited the effect of the first section was unsound.

The original National Banking Act of 1863 provided a forfeiture of the debt as the penalty for usury, and clearly that penalty was exclusive and suspended those provided by less stringent state statutes. (12 U. S. Stat. at Large, 665, § 46.) After that act had been in force for one year the act of 1864 was passed and thus the history of Federal legislation shows that it was the national policy "to keep the matter of the penalties to be imposed upon the banks for usurious transactions within the control of Congress." (*Cent. Nat. Bank* v. *Pratt*, 115 Mass. 539.) The case last cited is important not only on account of the high standing of the court that decided it, but also because it involved a note discounted by a national bank in this state and was mentioned with approval in the *Dearing* case. We further quote therefrom as follows: "We are of opinion that

it was within the constitutional power of Congress to fix the
rate of interest which a national bank might take upon a loan
of money and to determine the penalty to be imposed for tak-
ing a greater rate ; that such power, when exercised by Con-
gress, is exclusive of state legislation ; that the provision of
the thirtieth section of the Act of Congress we are consider-
ing imposing a penalty for taking unlawful interest applies
as well as to banks established in states where a rate of inter-
est is fixed by law as to banks in those where no rate is fixed,
and, therefore, that the laws of New York imposing penalties
for taking usury do not apply to national banks established
within its limits."

The meaning of the court is emphasized by what it said in
the next case reported in the same volume : " The defense that
the drafts in suit are void under the laws of New York against
usury, cannot be sustained. The act of Congress to provide
a national currency supersedes the state laws upon this sub-
ject so far as applicable to national banks." (*Davis* v. *Ran-
dall*, 115 Mass. 547, 551.)

The argument that if the legislature had intended by the
act of 1892 to repeal the usury law it would have included it
in the " schedule of laws repealed " is without force. The
legislature did not intend to repeal that law absolutely, for
without doubt it left it in force as to individuals. It wished,
as it expressly declared, to place state banks on an equality
with national banks as to the penalty for usury, and, hence,
made the forfeiture of the interest the sole penalty and thus
by necessary implication, in view of the Federal statute as
construed by the highest Federal court, repealed the usury law
as to state banks, leaving it unchanged in all other respects,
with certain exceptions not now material. This court held in
the *Hule* case that the first section of the act of 1870, " stand-
ing alone, would supersede the usury laws and operate as a
repeal by implication, so far as applicable to banking associa-
tions," but for the parity clause therein. As, however, it had
decided in the *Lamb* case that Congress had subjected national
banks to state laws on the subject of usury, it further held

that the parity clause prevented the repeal of the usury statute by placing both classes of banks on an equality. After the *Dearing* case was decided this court reversed its holding as to the effect of the parity clause, but it has never receded from its construction of the rest of the statute.

" The particulars" referred to in the parity clause of section 55 of the Banking Law are those previously mentioned therein and include interest, usury and the forfeiture therefor; "the purchase, discount or sale" of commercial paper and the like. With reference to those particulars the legislature in 1892, evidently with the *Dearing* case and our own decisions in mind, re-enacted the act of 1870 and again expressed its intention " to place and continue " state banks on an equality with national banks. It refrained from imposing a forfeiture of the debt when usurious paper was purchased in good faith by such banks. In other words it adopted the Federal statute, as construed by the Federal court, as to those particulars and modified the usury act accordingly. The repeal was by state statute, following a Federal statute, which had superseded *pro tanto* the state law against usury, but no state law upon any other subject was affected, because no other subject was specifically mentioned. It is only when a Federal statute speaks that the state statute must stand aside. (*Caponigri* v. *Altieri*, 165 N. Y. 255.)

We need not search for an express exemption, but only for an express forfeiture, and as no penalty is imposed by either statute for the purchase by a bank, in good faith and without notice, of a note void for usury as between the original parties, and the only penalty prescribed is when the bank acts " knowingly," it follows, if I have reasoned correctly, that the notes in question were valid in the hands of the Federal Bank and that they are valid in the hands of the plaintiff, its receiver, provided Congress had power to pass an act making its rule on the subject of usury the only rule applicable to national banks. It is gratifying to reach this conclusion, for otherwise, as was well said below, the result would be this: " That whereas when the bank was the wrongdoer and took

the usurious interest, although the usury statute declared the
note void the banking statutes made it valid as to its face
value and the wrongdoer escaped all forfeiture except in so
far as the interest was concerned ; while if the bank were an
absolutely innocent party and had taken the note in good
faith for a valuable consideration and without notice, receiv-
ing thereon only the legal interest on the face thereof, yet,
nevertheless, it would be punished for the illegal act of others
by the loss of the full amount advanced by it.    Such a result
would be so inequitable and illogical as to demonstrate that
the reasoning must be fallacious."

I shall endeavor to be brief in my discussion of the ques-
tion as to the power of Congress to supersede state laws
against usury, so far as they affect national banks.    The ques-
tion is already settled if I have properly construed the
National Banking Act and have correctly read the *Dearing*
case from which I quote again as follows : " The constitution-
ality of the act of 1864 is not questioned.    It rests on the
same principle as the act creating the second bank of the
United States.    The reasoning of Secretary Hamilton and of
this court in *M'Culloch* v. *Maryland* (4 Wheat. 316) and in
*Osborn* v. *The Bank of the United States* (9 id. 738) there-
fore applies.    The national banks organized under the act are
instruments to be used to aid the government in the adminis-
tration of an important branch of the public service.    They
are means appropriate to that end.    Of the degree of the
necessity which existed for creating them Congress is the sole
judge.    Being such means, brought into existence for this
purpose, and intended to be so employed, the states can exer-
cise no control over them, nor in any wise affect their operation,
except in so far as Congress may see proper to permit.    Any-
thing beyond this is ' an abuse, because it is the usurpation of
power which a single state cannot give.'    Against the national
will ' the states have no power, by taxation or otherwise, to
retard, impede, burthen or in any manner control the opera-
tion of the constitutional laws enacted by Congress to carry
into execution the powers vested in the general government.'

(*Bank of the United States* v. *McCulloch, supra ; Weston* v. *Charleston,* 2 Pet. 466; *Brown* v. *Maryland,* 12 Wheat. 419; *Dobbins* v. *Erie Co.,* id. 419.) The power to create carries with it the power to preserve. The latter is a corollary from the former. The principle announced in the authorities cited is indispensable to the efficiency, the independence and indeed to the beneficial existence of the general government; otherwise it would be liable in the discharge of its most important trusts to be annoyed and thwarted by the will and caprice of every state in the Union. Infinite confusion would follow. The government would be reduced to a pitiable condition of weakness. The form might remain, but the vital essence would have departed. * * * Whenever the will of the nation intervenes exclusively in this class of cases, the authority of the state retires and lies in abeyance until a proper occasion for its exercise shall recur. (*Gilman* v. *Philadelphia,* 3 Wall. 713 ; *Ex parte McNiel,* 13 id. 240.) The power of the states to tax the existing national banks lies within the category last mentioned. It must always be borne in mind that the Constitution of the United States, 'and the laws which shall be made in pursuance thereof,' are ' a supreme law of the land ' (Const. art. 6) and that this law is as much a part of the law of each state and as binding upon its authorities and people as its own local constitution and laws."

This is but the logical result of Chief Justice Marshall's great opinion in *M'Culloch* v. *Maryland* (4 Wheat. 415), which, with the approval of all the justices, held that Congress had power to incorporate a national bank, although the subject is not included among the powers expressly enumerated in the Constitution. As was said in a later case, the opinion rests upon the proposition that a national bank is an instrument which is " necessary and proper for carrying into effect the powers vested in the government of the United States." (*Osborn* v. *Bank of the United States,* 9 Wheat. 738, 860.)

If Congress has power to pass an act it has power to include such provisions as, in its judgment, will make the act effective, unless they are forbidden by the Constitution, expressly

or impliedly. (*Easton* v. *Iowa*, 188 U. S. 220.) Having the power to create national banks, it had the power to strengthen them by a general rule, operative in all the states, and to protect them from the varying policies of the different states with reference to the subject of usury, which otherwise might undermine their solvency and destroy their usefulness in certain localities. Their capital, as well as the capital of their depositors, is largely invested and their profits earned by the discount of commercial paper. To a great extent that is the business they are organized to carry on, and success or failure depends mainly upon it. Any restriction by state statute upon the power to safely discount such paper, tends to impair the efficiency of these governmental agencies and to defeat the purpose for which they were created. The penalty for taking usury, or ignorantly taking a note already infected with usury, is a dangerous restraint upon freedom of contract in discounting commercial paper, especially when the penalty is so severe as to defeat the debt and thus annihilate so much capital of the bank, even when the management is entirely innocent. It seems to be conceded that Congress has power to authorize national banks to discount paper and to fix the rate of interest on all that they discount, and it is a reasonable incident to that power to provide that paper taken in good faith and in due course shall not be subject to a defense founded only on a state statute in restraint of usury. Assuming that the doctrine which exempts Federal agencies from the effect of state laws is limited by the principle that a state statute which does not impair the usefulness of such agencies is not within the rule of prohibition, as was held in *National Bank* v. *Commonwealth* (9 Wall. 353), still the limitation does not apply to a statute which destroys much commercial paper and throws doubt upon all. Such an act necessarily impairs the capacity of the bank to act in the ordinary course of business without great danger. It hinders when there should be freedom and destroys when there should be safety.

While usury is within the scope of the police power, which is ordinarily under the control of the states, when that power

2

is so exercised by a state as to obstruct "a convenient, useful and essential instrumentality in the prosecution of the fiscal operations of government," such as national banks are held to be, it must give way to the supreme power of the nation.   Thus, it was held in *Easton* v. *Iowa* (*supra*) that even the criminal laws of a state when in conflict with the National Banking Act, must yield to the superior power of Congress.   In that case the president of a national bank was indicted, convicted and sentenced to imprisonment under the provisions of a state statute for the offense of having received, as such officer, a deposit of one hundred dollars in money for said bank at a time when it was not only insolvent, but such insolvency was known to the defendant.   The judgment was reversed, and Mr. Justice SHIRAS, speaking for all the members of the court, after referring to the National Banking Act, said :   " That legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation, which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states."   After quoting from the *Dearing* case the learned justice continued :   "Such being the nature of these national institutions, it must be obvious that their operations cannot be limited or controlled by state legislation, and the Supreme Court of Iowa was in error when it held that national banks are organized and their business prosecuted for private gain, and that there is no reason why the officers of such banks should be exempted from the penalties prescribed for fraudulent banking.   Nor is it altogether true, as asserted by that court, that there is no act of Congress prohibiting the receipts of deposits by national banks or their officers when a bank is insolvent. It is true that there is no express prohibition contained in the Federal statutes, but there are apt provisions, sanctioned by severe penalties, which are intended to protect the depositors and other creditors of national banks from fraudulent banking."   He then declared that a national bank is authorized, among other things, " to make contracts,    *    *    *    to exer-

cise, by its board of directors or duly authorized officers, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts and bills of exchange; by receiving deposits; by buying and selling exchange; by loaning money on personal security. * * * It thus appears that Congress has provided a symmetrical and complete scheme for banks to be organized under the provisions of the statute." After reviewing many cases he finally said: " Our conclusions, upon principle and authority, are that Congress, having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks and has the sole power to regulate and control the exercise of their operations; that it is not competent for state legislatures to interfere, whether with hostile or friendly intentions with national banks or their officers in the exercise of the powers bestowed upon them by the general government." This case was expressly approved in *McClellan* v. *Chipman* (164 U. S. 347) and held not to conflict with *National Bank* v. *Commonwealth* (9 Wall. 353). The *McClellan* case did not involve the power of Congress, but the question whether a state act violated a Federal act and it was held that it did not.

In *Davis* v. *Elmira Savings Bank* (161 U. S. 275), an act of the legislature of this state providing for the payment by the receiver of an insolvent bank, in the first place, of deposits in such bank by savings banks, was held to be in conflict with the National Banking Act, and, therefore, void when attempted to be applied to an insolvent national bank. The court was unanimous and Mr. Justice WHITE delivering its opinion, said: " National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States and either frustrates the purpose of national legislation or impairs the efficiency of these agencies

of the Federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic and are sanctioned by the repeated adjudications of this court. * * * It is certain, that in so far as not repugnant to acts of Congress, the contracts and dealings of national banks are left subject to the state law, and upon this undoubted premise, which nothing in this opinion gainsays, the proposition is advanced that the deposits here considered of the savings bank with a national bank import a contract to pay the claim of the former with the preference allowed by the New York statute. * * * If the law of the state is to be read into the contract then, of course, the law of Congress should also be read into it. We should thus have to consider all the deposits as made with an implication that they were subject to the Federal law and, hence, the conflict between the two laws would become evident and the Federal law, being paramount, would prevail." (See, also, *Henderson* v. *Mayor*, etc., 92 U. S. 259, 271.)

If these cases and the cases cited therein, to which I shall not further refer, rest on sound principles, as we are bound to assume, can it be held that Congress has no power to provide a penalty for usury as affecting national banks in any and every aspect to the exclusion of all state laws upon the subject? With power to place in abeyance the criminal and insolvent laws of a state as applied to those banks and their officers, has it no power to supersede a state law which attacks the solvency of every national bank within its limits? May an agency of the United States government be destroyed or its usefulness and efficiency seriously impaired by state legislation which directly tends to bring about that result? The question of policy or expediency is not before us, but simply whether the nation has the power to protect itself and its instrumentalities from grave injury if not total destruction. To hold that it does not would reach far and lead to startling results. The right to create and protect national banks, although not named in the Constitution, is well established by the decisions of the highest Federal court and any attempt to

limit the powers and functions of such banks is an attempt to limit a law which is "necessary and proper" for carrying into execution powers vested by the Constitution in the government of the United States. In view of the dual character of our government, the one state and the other national, when the latter has jurisdiction over a subject its action, of necessity, is paramount, and to the extent of any conflict between state and national legislation must render nugatory all state acts repugnant thereto.

The argument that a state cannot grant an exceptional privilege to a state bank because it would be class legislation, is foreclosed by the settled law that state banks knowingly taking usury forfeit the interest only, the same as national banks, whereas all other corporations, as well as all persons and firms, forfeit both principal and interest. The right to give this exclusive privilege to state banks is thoroughly supported by authority. A classification is justified which frees state banks from injurious competition with national banks by placing the former in the same position as the latter with reference to the subject of usury.

Without prolonging the discussion I think that the National Banking Act was intended to supersede all state laws on the subject of usury as applied to national banks and that Congress had power to pass the act as thus construed. The judgment appealed from should, therefore, be affirmed, with costs.

CULLEN, Ch. J. (dissenting). I dissent from the decision about to be made. That statutes regulating the rate of interest to be charged for loans of money and punishing usury are a constitutional exercise of the police power of the state is settled by authority. (Cooley's Principles of Constitutional Law [3d ed.], p. 260.) Such laws may be, as claimed by the political economists, mere relics of barbarism. Nevertheless, as they have been enacted for ages in every country, nobody but a theorist would deny their validity however much jurists might deplore their drastic character. In this

state from the year 1787, when the first statute was passed on the subject, until the present time, with the exception of the period between the years 1830 and 1837, usury has rendered all securities infected therewith absolutely void, not only between the parties but as to purchasers in good faith, and not only as to non-negotiable securities but also as to commercial paper. This has been most forcibly stated by my brother VANN in the case of *Claflin* v. *Boorum* (122 N. Y. 385), and I cannot do better than quote his language : " The loan, when made, was a violation of the statute, and the notes were thus rendered absolutely void and no subsequent transaction could make them valid: Even if, as the plaintiffs claim, they purchased the notes before maturity for value and without notice, they cannot enforce them, because the vice of usury follows a promissory note into the hands of a *bona fide* holder. A note void in its inception for usury continues void forever, whatever its subsequent history may be. It is as void in the hands of an innocent holder for value as it was in the hands of those who made the usurious contract. No vitality can be given to it by sale or exchange, because that which the statute has declared void cannot be made valid by passing through the channels of trade." Such being the general rule of law, it is now about to be decided that a note given by A to B for a usurious loan, though void not only in the hands of B and every other human being or corporation but a bank, is vitalized and rendered valid through its purchase or discount by a bank, even though the bank has knowledge of its usurious character. This result is claimed to have been effected by the provisions of the National Banking Act and of our statute of 1870 placing state banks on a parity with national banks. It is seriously urged that such a rule of exceptional favoritism is necessary to the security of the banking business, and it is said that a contrary ruling would carry confusion into all channels of trade. Though the question has not been passed on by this court, it has been necessarily involved in three cases in the Supreme Court (*Union Bank of Rochester* v. *Gilbert,* 83 Hun, 417 [1894]; *Freeport*

*Bank* v. *Hagemeyer,* 91 id. 194 [1895]; *Union Bank of Rochester* v. *Benedict,* 35 App. Div. 216 [1898]), in each of which the decision was adverse to the claim now made for the respondent. Indeed, the suggestion that in the purchase of paper void for usury between third parties a bank stood in any different position from any other purchaser is not to be found in the reports until the decision of the Appellate Division of the first department in the case of *Schlesinger* v. *Kelly* (114 App. Div. 546), not a year since. Of course, if the effect of the statute of 1870 is to relieve a bank from loss on the purchase of a usurious note it should be given full effect, even though the point was not discovered till the last month, but when we bear in mind that for three-quarters of a century it was the unquestionable law that usurious paper such as now before us was void in the hands of a bank ; that for over a quarter of a century subsequent the only judicial decisions on the subject declared that that law still continued, and when we further consider that during that period of a full century New York has grown from a comparatively insignificant town to be the commercial metropolis of the country and as a financial center, if second to any city in the world, to London alone, despite the drastic and possibly unjust usury laws of the state, the argument that unless we now reverse the law of the past century banking business will be imperilled and the channels of trade thrown into confusion, may be dismissed as chimerical. The history of banking in our state does record many discreditable failures, but I have never heard of one which was in any way occasioned by this provision of the Usury Law.

As to the statement made by counsel for the respondent of an alleged fact not appearing in the record, that the makers "of more than one-half the commercial paper held by the Federal Bank at the time of its failure alleged a usurious origin thereof," it may be said that further research also outside of the record discloses that the president of this bank is now a convict in states prison for the offense of grand larceny. What has driven the bank into a receivership does not appear,

but it is as easily attributable to the fact that it had a dishonest president as to the severity of our usury law. Having thus disposed of these extraneous considerations we are now brought to a consideration of the law of the case.

I insist on three propositions : 1st, that the Federal statute deals only with the action of the national banks in taking excessive interest, and has no application to the effect of usury between prior parties to the instrument ; 2d, that Congress has no constitutional power to legislate on the validity or invalidity of contracts made between third parties having no relation to the national banks, and 3d, that even if Congress has the power claimed and has exercised it in favor of the national banks, the legislature has no power to extend a similar exemption and exception in favor of state banks. As to the first proposition, the Federal statute enacts that national banks shall be allowed to take the rate of interest permitted by the state or territory where they are located, and in the absence of any local law a rate not exceeding seven per cent per annum. It then provides that the taking of a greater rate of interest than that allowed shall be adjudged a forfeiture of the entire interest on the note, and in case the excess of interest has been paid, that the party paying it may recover from the bank double the amount paid. The statute deals exclusively with the action of the bank in taking interest from the person to whom it loans the money or for whom it discounts the paper. It does not regulate nor assume to regulate in any degree the dealings of the prior parties to the instrument as between themselves or the effect of those dealings on parties who do not contract with the bank. It is confined to the dealings of a bank with its customers. So true is this that even at this day it is an open question in the Supreme Court of the United States whether a national bank can purchase commercial paper as distinguished from discounting it, and if it can, whether the interest provisions of the act of Congress are applicable to such a transaction or not. (*National Bank* v. *Johnson*, 104 U. S. 271.) Doubtless, when a national bank discounts a note for its customer it is entitled to all the rights

against the other parties to the note that the law would give
any holder. The rights against third parties, however, pro-
ceed exclusively from the state law, not from the Federal law.
The law of negotiable instruments is not constitutionally
sacrosanct. Radical and preposterous as the action might be
it would not be unconstitutional for the state to abolish the
law of negotiable instruments and make all instruments for
the payment of money, though in the hands of *bona fide*
holders, open to the defenses and equities of the original
parties. This state has done so in the case of notes given for
money lost at gaming or to purchase lottery tickets, as well as
notes infected by usury, and the constitutionality of the action
has never been questioned. It has done so recently in the
case of notes given for patent rights. This court has unani-
mously upheld the validity of the statute (*Herdic* v. *Roess-
ler*, 109 N. Y. 127), and the Supreme Court of the United
States has sustained similar legislation of the state of Kansas.
(*Allen* v. *Riley*, 203 U. S. 347.) On the other hand, the
state has at times made instruments negotiable which were
not so at common law, such as warehouse receipts and bills of
lading. It is a curious confusion of ideas to speak of the ina-
bility of a bank to collect from the maker a note void for
usury between him and the payee for whom the bank has dis-
counted it, as a forfeiture, and to argue that since if the bank
had taken usury it would have lost only the interest, it cannot
be subjected to a greater loss where it has been guilty of no
usury. A forfeiture is a penalty imposed for misconduct or
fraud. The bank forfeits nothing in a case of the character
of that before us. The indorser for whom it discounted the
note is liable to the bank for its full amount, and if he repre-
sented that the note was a valid instrument and free from
infirmity, he can be prosecuted as a felon. True, the bank
loses the responsibility of the maker, if it can properly be said
to lose that which it never had. Were the maker an infant or
his signature a forgery in neither case would he be liable, but
it would be an improper use of language to say that by reason
of either fact the bank had been subjected to a forfeiture.

The principle involved in the present case has, in my judgment, been expressly decided by the Supreme Court of the United States in *McClellan* v. *Chipman* (164 U. S. 347). There it was held that a national bank took real estate subject to the provisions of the Massachusetts law rendering all conveyances void by the insolvent debtor with an intention to give a preference, though the National Banking Act expressly authorized a bank to take such real estate as might be mortgaged in good faith by way of security for debts previously contracted. Mr. Justice White reiterates the declaration previously made in *National Bank* v. *Commonwealth* (9 Wall. 353): "National banks are subject to the laws of the state and are governed in their daily course of business far more by the laws of the state than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional."

The whole fabric of the respondent's argument on this question is based on a practice against which I have often had occasion to protest, that is, the excerpting of expressions from judicial opinions and construing them without regard to their context or the subject then before the court. (*Fealey* v. *Bull*, 163 N. Y. 397; *National Harrow Co.* v. *Bement & Sons*, 163 id. 505.) Doubtless the courts have often said that the National Banking Act repealed the state usury laws so far as national banks were concerned. Doubtless this declaration was entirely correct so far as applied to the action of national banks in taking unlawful interest, which was the only subject-matter before the court in any of these cases, and the declarations of the courts must be limited to the cases before them. The present case is the first of its character that we can find has ever been presented to the courts either Federal or State, with the exception of the three cases in the Supreme Court of this state already noticed. The error of construing the declaration

of a court, apart from the case then before it, is well exempli-
fied by the statute of 1850, which forbade corporations to
plead usury. The courts had several times said that the effect
of this statute was to repeal the Usury Law so far as corpora-
tions were concerned, yet when the precise question came up
this court held that the statute only forbade the plea of usury
by a corporation to defeat its own contract, but that when a
corporation succeeded to the title of a third party to property,
which was the subject of a usurious loan it might avoid that
loan for usury the same as any other person. (*Merchants'
Exchange Nat. Bank* v. *Commercial Warehouse Co.*, 49
N. Y. 635. See opinion, p. 641.)

I have said that it is about to be decided that even though
a bank, national or state, takes a note with knowledge of the
usury between the original parties, it may enforce it, and I
contend that this is the necessary import of the decision.
The theory of the decision is that the Federal statute abolished
or superseded all usury laws of the state as to paper a national
bank might discount. The only provision of the Federal stat-
ute is that which enacts that if a bank takes usury it shall
forfeit twice the interest. The " knowingly " found in the
statute applies solely to knowingly taking excessive interest,
not to any knowledge of the prior character of the note. If
this is the only provision of law extant on the subject, so long
as the bank itself does not take usury in discounting the note,
what possible statute, state or national, can render a note void
or uncollectible, even if the bank had full knowledge of the
inception of the note? And in fact, even if it took usury in
discounting it, on what principle of law could it be subjected
to any other penalty than that provided in the statute for the
forfeiture of double the interest? There is no provision in
the Federal statute as to the effect of usury on prior parties to
the note. Usury only affects the note by virtue of the state
statute declaring the usurious note void. If that statute is
abrogated from the instant the note is purchased by the bank,
what has the knowledge of the bank that it was usurious
between the original parties to do with the question before

us? There is no middle ground upon which to stand. Either the usurious note is void even though the bank is ignorant of the usury, or it is good though the bank does know of it.

I deny that Congress has the power to enact a statute susceptible of the interpretation that is about to be given. Doubtless it may prescribe an exclusive rule for the government of the transactions of national banks and for the dealings of parties with them. Thus it has been held that the penalties imposed by the Federal statute upon national banks for taking usury are exclusive, and also it has been held that state statutes making criminal certain conduct of national bank officers is an invasion of the powers of Congress. (*Farmers & M. Nat. Bank* v. *Dearing*, 91 U. S. 29; *Easton* v. *Iowa*, 188 id. 220.) I concede plenary power in Congress to regulate all transactions between national banks and parties contracting with them. I assume that it might enact that neither infancy nor coverture should be a defense to a claim for money borrowed from a bank or to an obligation given to a bank. But the note sued on in this case, so far as the maker is concerned, involved no transaction with any national bank. It was a transaction had in this state, solely between citizens of this state, the validity of which must be determined solely by the laws of this state. By those laws the note was void and imposed no liability on the defendant. Congress cannot vary the legal effect of a contract or transfer of property had exclusively between citizens of a state in that state merely by reason of the voluntary action of a national bank intervening and purchasing that obligation. If so Congress might equally prescribe that when a bank purchases mortgages it should hold them free from any defense or equity. It might vary the tenure of all property in this state simply because a national bank saw fit to purchase or assume to purchase some interest therein. That it might be well for the bank to have notes free from all defenses may be assumed, but this is not sufficient to deprive the state of jurisdiction upon the subject. It is not everything that incidentally affects a function of government vested in Federal control that limits the police power

of the states. To take an act without the domain of state regulation it must affect the functions of the national government directly, not incidentally. In *Pennsylvania R. R. Co.* v. *Knight* (192 U. S. 21) the validity of a state tax upon cab service connected with the Pennsylvania railroad in this state was challenged. It was there said: " Many things have more or less close relation to interstate commerce which are not properly to be regarded as a part of it. If the cab which carries the passenger from the hotel to the ferry landing is engaged in interstate transportation, why is not the porter who carries the traveler's trunk from his room to the carriage also so engaged ? If the cab service is interstate transportation are the drivers of the cabs and the dealers who supply hay and grain for the horses also engaged in interstate commerce ? And where will the limit be placed ? " It doubtless curtails the Federal revenue derived from licenses upon the sale of liquor for the state to prohibit such sale within its limits, yet it has never been doubted that the legislation was a valid exercise of the police power of the state. (*McGuire* v. *Commonwealth,* 3 Wall. 387 ; *License Tax Cases,* 5 Wall. 462 ; *Beer Co.* v. *Massachusetts,* 97 U. S. 25 ; *Mugler* v. *Kansas,* 123 id. 623 ; *Kidd* v. *Pearson,* 128 id. 1 ; *Matter of Rahrer,* 140 id. 545.) In the last case cited Chief Justice Fuller said: " The power of the state to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government nor directly restrained by the Constitution of the United States and essentially exclusive. And this court has uniformly recognized state legislation, legitimately for police purposes, as not in the sense of the Constitution necessarily infringing upon any right which has been confided expressly or by implication to the national government." So, also, in *United States* v. *E. C. Knight Co.* (156 U. S. 1) it was held that the manufacture of a necessity of life did not constitute a part of interstate commerce so as to authorize its regulation by the

Federal government. It was there said: "Doubtless the power to control the manufacture of a given thing involves in a certain sense the control of its disposition, but this is a secondary and not the primary sense; and although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly." In *Hopkins* v. *United States* (171 U. S. 578) it was held that an agreement among the members of a live stock exchange did not affect interstate commerce so as to fall within the act of Congress prohibiting combinations. Authorities might be multiplied to the effect that to render a regulation by the state in the exercise of its police power void as conflicting with the powers of Congress, the operation of the regulation must be direct and not collateral or incidental. Even though the power of Congress were conceded, the Supreme Court of the United States held it to be "the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of Congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together." (*Missouri, K. & T. Ry. Co.* v. *Haber*, 169 U. S. 613, 623.)

But if Congress possess the power claimed and has exercised it in favor of national banks, it does not follow that the state has the same right to grant the exceptional privilege to state banks. This position does not rest on any claim that the state might not abolish or modify the usury laws, but on the ground that it is class legislation of the most extreme character, I think, that has ever come before the courts. The only authority that exists for the Federal government to charter national banks is that they are fiscal agencies of the government. The whole question of Federal authority was reviewed by the Supreme Court of the United States in *Osborn* v. *Bank of the United States* (9 Wheat. 738). In the opinion there delivered Chief Justice MARSHALL, in answering the contention that the state had power to tax the bank, said: "The

foundation of the argument in favor of the right of a State
to tax the bank is laid in the supposed character of that
institution. The argument supposes the corporation to have
been originated for the management of an individual con-
cern, to be founded upon contract between individuals,
having private trade and private profit for its great and
principal object. If these premises were true, the con-
clusion drawn from them would be inevitable. This mere
private corporation, engaged in its own business, with its
own views, would certainly be subject to the taxing power
of the state, as any individual would be; and the casual cir-
cumstance of its being employed by the government in the
transaction of its fiscal affairs would no more exempt its private
business from the operation of that power than it would
exempt the private business of any individual employed in
the same manner. But the premises are not true. The bank
is not considered as a private corporation, whose principal
object is individual trade and individual profit, but as a public
corporation created for public and national purposes. That
the mere business of banking is, in its own nature, a private
business, and may be carried on by individuals or companies
having no political connection with the government, is admit-
ted; but the bank is not such an individual or company. It
was not created for its own sake or for private purposes."
This being the theory of the creation of national banks, that
they are actually governmental agencies, it may be that Con-
gress can confer upon them rights and privileges greater than
that of any other individual or corporation in the country, but
the statutes of this state will be searched in vain for any con-
nection between the government of the state and state banks.
The state banks are no more governmental agencies of the
state than are insurance companies, manufacturing companies,
or other business corporations. The statute authorizing the
incorporation of banks and the regulation of their conduct
contemplates a corporation organized, to use the language
of Chief Justice MARSHALL, with " private trade and private
profit for its great and principal object." The bank which

this plaintiff represents was no more an agent of the state or engaged in the discharge of a governmental function than a Herkimer county dairy company.   The state cannot, therefore, grant to such corporations rights and privileges beyond every other citizen of the state.   It may be said that this objection would apply with equal force to the statutory provision which enacts that state banks taking usury only forfeit the interest, the same as national banks, while individuals and other corporations forfeit the whole principal, the validity of which enactment has been recognized by the courts.   I think a distinction may be drawn between the two cases, but that it is not necessary to consider.   The unconstitutionality of class legislation is a doctrine only recently developed in the courts, but, nevertheless, it has of late years become firmly established.   It has principally arisen in the the Federal courts and in other states in relation to anti-trust and labor laws. In *Connolly* v. *Union Sewer Pipe Co.* (184 U. S. 540) the Supreme Court of the United States held a statute of Illinois prohibiting combinations to prevent competition in the manufacture and sale of goods void, because it exempted from its operation persons or associations of agriculturists or raisers of live stock.   The doctrine of that case was applied by this court in *Matter of Pell* (171 N. Y. 48), and still more recently in *Wright* v. *Hart* (182 N. Y. 330), where a statute of this state forbidding the sale by merchants of their stocks of merchandise in bulk was held unconstitutional and void because it arbitrarily denied the right of a specified class of citizens to contract for the sale of their property in the way permitted to other citizens.   I dissented in the case cited, but had the difference in the rights afforded to one class of citizens and denied to the other been a tithe of the privilege accorded to the favored class in the present case, I should have unqualifiedly concurred.   As already stated, the decision about to be made is to the effect that a bank, merely because it is a bank, may purchase and enforce a note or obligation that is void between the parties, and void in the hands of every person or corporation other

than a bank who might purchase it in good faith and for a valuable consideration, and this, I say, although the bank knows of its usurious character at the time of its purchase. The most extravagant claim for legislation in favor of labor never approximated in favoritism to this. The objection I make is not as to the absence of difference in circumstance to justify a classification for proper purposes, but a denial of the power of the state to authorize a member of a favored class to determine simply of his or its own volition whether a contract entered into by other citizens shall be valid or not; in other words, to leave to A, a private citizen, the power to determine by his purchase or refusal to purchase a note from B to C, whether that note shall be void or not. It would be a shabby bank which would not, at the solicitation of a director or a large stockholder or depositor, discount for him a note void for usury and thus enable him to enforce indirectly an obligation which the statute says shall be absolutely void.

I shall not discuss at any length the effect of the Negotiable Instruments Law (L. 1897, ch. 612, § 96). I think that under well-settled principles of statutory construction we cannot construe its general language as repealing the provisions of the usury, gaming and lottery laws, which render obligations given on such considerations absolutely void. The Negotiable Instruments Law applies only to commercial paper, and the effect of the usury and gaming statutes, like that relating to patent rights, is to withdraw notes given on such considerations from the domain of negotiable instruments. (*Eastman* v. *Shaw*, 65 N. Y. 522.) If, however, the decisions in this case were to proceed on the effect of the Negotiable Instruments Law, I should confine myself to the expression of my vote. Though I cannot concur in such a decision, I appreciate that it would eliminate from the usury laws their most harsh and drastic features, and probably be far more just than the provisions of the old law. Such a decision would inure to the benefit of all purchasers in good faith of commercial paper. The decision about to be made, however, instead of ameliorating the character of our usury

3

laws only accentuates and increases the injustice of their provisions.

The judgments of the Appellate Division and Trial Term should be reversed and a new trial ordered, with costs to abide the event.

GRAY and CHASE, JJ., concur with VANN, J., and WILLARD BARTLETT, J., concurs in result on the ground that under the Negotiable Instruments Law a *bona fide* purchaser takes a note free from the defense of usury; WERNER and HISCOCK, JJ., concur with CULLEN, Ch. J.

Judgment affirmed.